*In The*
# United States Court Of Appeals
## For The Federal Circuit

## DIGITAL ALLY, INC., a Nevada corporation,

*Plaintiff-Appellant,*

v.

## UTILITY ASSOCIATES, INC., a Georgia company,

*Defendant-Appellee.*

Appeal from the United States District Court for the
District of Kansas in Case No. 2:13-cv-02550,
Senior Judge Sam A. Crow.

_____

## NON-CONFIDENTIAL BRIEF OF APPELLANT

_____

**Adam P. Seitz**
**ERISE IP, P.A.**
**6201 College Boulevard**
**Suite 300**
**Overland Park, Kansas 66211**
**Tel.: (913) 777-5600**
**Fax: (913) 777-5601**
**Email: adam.seitz@eriseip.com**

*Counsel for Appellant*

# CERTIFICATE OF INTEREST

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

### DIGITAL ALLY, INC. v. UTILITY ASSOCIATES, INC.
### No. 2014-1420

Counsel for Plaintiff-Appellant certifies the following:

1.  The full name of every party or amicus represented by me is:

    Digital Ally, Inc.

2.  The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

    Not applicable.

3.  All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

    None.

4.  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

    Adam P. Seitz and Eric A. Buresh of ERISE IP, P.A.

    ERISE IP, P.A.
    6201 College Boulevard
    Suite 300
    Overland Park, Kansas 66211
    Tel.: (913) 777-5600
    Fax: (913) 777-5601
    Email: adam.seitz@eriseip.com
    Email: eric.buresh@eriseip.com

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ........................................................................i

TABLE OF CONTENTS........................................................................... ii

TABLE OF AUTHORITIES .....................................................................iv

TABLE OF ABBREVIATIONS ............................................................... vii

STATEMENT OF RELATED CASES .................................................... viii

PRELIMINARY STATEMENT ..................................................................1

JURISDICTIONAL STATEMENT ............................................................3

STATEMENT OF THE ISSUES.................................................................3

STATEMENT OF THE CASE.....................................................................3

      I.     Statement of Facts ........................................................4

           A.     Digital Ally ........................................................4

           B.     Utility's Predecessor-in-Interest ..................5

           C.     Utility's Contacts with Kansas.....................5

           D.     The '556 Patent ...............................................8

           E.     Utility's Threat Letters..................................9

           F.     Digital Ally's Declaratory Judgment Action ............10

SUMMARY OF THE ARGUMENT .........................................................11

ARGUMENT ............................................................................................11

I.  Standard of Review ..........................................................................11

II. Discussion of the Issues ...................................................................12

III. Utility Purposefully Directed Its Activities at Digital Ally in Kansas.........................................................................................15

IV. Digital Ally's Claims for Declaratory Judgment Arise Out Of or Relate To Utility's Activities in Kansas.............................................19

    A.  Digital Ally's Declaratory Claim for Noninfringement ..........20

    B.  Digital Ally's Declaratory Claim of Equitable Estoppel.........23

V.  The Exercise of Personal Jurisdiction in Kansas Is Reasonable and Fair....................................................................................27

CONCLUSION .......................................................................................31

ADDENDUM

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

## <u>CONFIDENTIAL MATERIALS STATEMENT</u>

Pursuant to Fed. Cir. Rule 28(d)(1)(B), confidential material has been redacted from this brief. Specifically, confidential information that is subject to a granted motion to file under seal in the district court has been redacted on page 10.

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A.C. Aukerman Co. v. R.L. Chaides Const. Co.*,
  960 F.2d 1020 (Fed. Cir. 2002) ...............................................................24, 26

*Akro Corp. v. Luker*,
  45 F.3d 1541 (Fed. Cir. 1995) ...........................................................*passim*

*Asahi Metal Indus. Co. v. Super. Ct. of Cal.*,
  480 U.S. 102 (1987)............................................................................28

*Autogenomics, Inc. v. Oxford Gene Technology Ltd.*,
  566 F.3d 1012 (Fed. Cir. 2009) .....................................................19

*Avocent Huntsville Corp. v. Aten Intern. Co., Ltd.*,
  552 F.3d 1324 (Fed. Cir. 2008) ...............................................*passim*

*Barnes & Noble, Inc. v. LSI Corp.*,
  849 F. Supp. 2d 925 (N.D. Cal. 2012)........................................26

*Behagen v. Amateur Baskeball Ass'n of the United States*,
  744 F.2d 731 (10th Cir. 1984) ..................................................12

*Beverly Hills Fan Co. v. Royal Sovereign Corp.*,
  21 F.3d 1558 (Fed. Cir. 1994) ..................................................28

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985)...............................................................13, 14, 15, 17

*Cybor Corp. v. FAS Techs., Inc.*,
  138 F.3d 1448 (Fed. Cir. 1998) .............................................21, 26

*Deprenyl Animal Health, Inc. v. Univ. of Toronto Innovations Found.*,
  297 F.3d 1343 (Fed. Cir. 2002) .............................................*passim*

*Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*,
    114 F.3d 1547 (Fed. Cir. 1997), *abrogated on other grounds by*
    *Cybor Corp. v. FAS Techs., Inc.*,
    138 F.3d 1448 (Fed. Cir. 1998) ...................................................................26

*Elecs. for Imaging, Inc. v. Coyle*,
    340 F.3d 1344 (Fed. Cir. 2003) ...........................................................12, 18, 30

*Grober v. Mako Prods., Inc.*,
    686 F.3d 1335 (Fed. Cir. 2012) ..................................................................12

*Inamed Corp. v. Kuzmak*,
    249 F.3d 1356 (Fed. Cir. 2001) ............................................................*passim*

*International Shoe Co. v. Washington*,
    326 U.S. 310 (1945)....................................................................................13

*Jamesbury Corp. v. Litton Indus. Prods., Inc.*,
    839 F.3d 1544 (Fed. Cir. 1988), *overruled on other grounds by*
    *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*,
    960 F.3d 1020 (Fed. Cir. 2002) ...................................................................26

*Matter of Hesston Corp.*,
    870 P.2d 17 (Kan. 1994)..............................................................................13

*In re Novon Int'l., Inc.*,
    No. 98-cv-0677E, 2000 WL 432848 (W.D.N.Y. Mar. 31, 2000) .................27

*OMI Holdings, Inc. v. Royal Ins. Co. of Canada*,
    149 F.3d 1086 (10th Cir. 1998) ...................................................................13

*Patent Rights Prot. Group, LLC v. Video Gaming Techs., Inc.*,
    603 F.3d 1364 (Fed. Cir. 2010) ...................................................................30

*Precor Inc. v. Keys Fitness Products, L.P.*,
    178 F.3d 1313 (Fed. Cir. 1999) ...................................................................29

*Radio Systems Corp. v. Accession, Inc.*,
    638 F.3d 785 (Fed. Cir. 2011) .....................................................................19

*Radio Sys. Corp. v. Lalor*,
709 F.3d 1124 (Fed. Cir. 2013) ...................................................26

*Red Wing Shoe Co., Inc.  Hockerson-Halberstadt, Inc.*,
148 F.3d 1355 (Fed. Cir. 1998) ...................................................15

*Silent Drive, Inc. v. Strong Indus., Inc.*,
326 F.3d 1194 (Fed. Cir. 2003) ...................................................12

*Teradyne, Inc. v. Hewlett-Packard Co.*,
No. C-91-0344 MHP, 1994 WL 327213 (N.D. Cal. June 24, 1994) ...... 26-27

## Statute

28 U.S.C. § 1295(a)(1) ...................................................................3

# TABLE OF ABBREVIATIONS

*Parties*

Digital Ally            Plaintiff-Appellant Digital Ally, Inc.

Utility                 Defendant-Appellee Utility Associates, Inc.

*Cites*

A___                    Joint Appendix at page(s) ___

*Terms*

'556 Patent             U.S. Patent No. 6,831,556

PTO                     United States Patent and Trademark Office

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to FED. CIR. RULE 47.5(a), Digital Ally states that no appeal, other than the current appeal by Digital Ally, has been taken in or from the same civil action or proceeding in the lower court. Pursuant to FED. CIR. RULE 47.5(b), Digital Ally states there is one other case pending between the parties that may directly affect or be directly affected by this Court's decision in this pending appeal: *Utility Associates, Inc. v. Digital Ally, Inc.*, No. 1:14-cv-01847-RWS (N.D. Ga.) (Utility's patent infringement action against Digital Ally involving the '556 Patent). Additionally, though it involves different claims and should not be affected by this appeal, Digital Ally identifies the following tort/contract/trade secret action pending in the United States District Court for the District of Kansas between Digital Ally and Utility: *Digital Ally, Inc. v. Utility Associates, Inc. et al.*, Case No. 2:14-cv-02262-CM-KMH (D. Kan.).

## PRELIMINARY STATEMENT

The outcome of this appeal centers on what appears to be two novel questions for specific jurisdiction in the context of a motion to dismiss. First, does a declaratory claim of noninfringement "arise out of or relate to" contacts in Kansas by a patent owner relating to the technical operation of the accused products even if the patent owner has not yet acquired the patent? Digital Ally believes that answer must be yes. If the patent owner's contacts to a forum relate to the acquisition of technical details on the operation of a product, a declaratory judgment claim for noninfringement necessarily relates to (if not arises out of) those very same contacts, even if the patent owner acquires the patent after the requisite contacts were made with the forum.

Second, can prior contacts in Kansas by a patent owner's predecessor-in-interest give rise to specific jurisdiction for an equitable estoppel claim against the current patent owner? This Court as well as other district courts have confirmed that equitable estoppel and laches apply to successors-in-interest and Digital Ally believes that same analysis should apply to the question of specific jurisdiction. A patent owner should not be allowed to wash its actions giving rise to both jurisdiction and estoppel by transferring the patent to another owner.

The facts are largely undisputed. Prior to January 2013, Utility's predecessor-in-interest met with Digital Ally in Kansas to discuss Digital Ally's

technology and a possible joint venture between the companies. Through this predecessor-in-interest's actions and conduct, Digital Ally was led to believe that the '556 Patent would not be asserted against it. Subsequent to those meetings, Utility began engaging Digital Ally in Kansas over a fifteen-month period, starting in late 2010. Nearly all of these interactions related to the technical operation of Digital Ally's mobile surveillance products. Moreover, Utility purposefully directed each of these contacts into the State of Kansas. Utility, however, did not acquire the '556 Patent until approximately one year after these contacts were made. The debate between the parties is two-fold: (1) whether this delay between ownership of the patent and the contacts with Kansas is sufficient to defeat specific jurisdiction; and (2) whether the predecessor-in-interest's contacts with Kansas are sufficient to establish specific jurisdiction in Kansas against the current patent owner. The district court agreed with Utility and erred in its conclusory analysis that a declaratory judgment claim for noninfringement cannot "arise out of or relate to" the contacts because Utility did not own the patent at the time of the contacts. Digital Ally disagrees. Moreover, the district court provided no analysis on whether these contacts "arise out of or relate to" Digital Ally's equitable estoppel claim.[1]

---

[1] In the district court proceedings, Digital Ally also argued that Utility was subject to general jurisdiction. For purposes of this appeal, Digital Ally is only arguing that Utility is subject to specific jurisdiction.

## JURISDICTIONAL STATEMENT

Pursuant to 28 U.S.C. § 1295(a)(1), this Court has jurisdiction over Digital Ally's timely appeal from the final judgment of the district court. (A013.)

## STATEMENT OF THE ISSUES

Whether the judgment of the district court, finding no personal jurisdiction for Digital Ally's declaratory judgment action, should be reversed, or at least vacated, where the judgment was premised on a legally erroneous interpretation of the law. Specifically, whether Utility's contacts with the State of Kansas relating to the technical operation of Digital Ally's mobile surveillance products are sufficient to establish personal jurisdiction for the declaratory judgment of noninfringement action filed by Digital Ally in Kansas, and, additionally, whether Utility's predecessor-in-interest's contacts with Kansas are sufficient to establish personal jurisdiction in Kansas over the current patent owner for a claim of equitable estoppel, where both causes of action were sufficiently pled in Digital Ally's Complaint, which must be construed in a light most favorable to Digital Ally.

## STATEMENT OF THE CASE

Digital Ally filed a declaratory judgment action in the United States District Court for the District of Kansas seeking a declaratory judgment of noninfringement of the '556 Patent and a declaratory judgment of unenforceability of the '556

Patent due to equitable estoppel. (A032-033 at ¶¶ 16-21.) Utility filed a motion to dismiss based on lack of personal and subject mater jurisdiction of the district court. The district court granted Utility's motion to dismiss, finding no personal jurisdiction for Digital Ally's declaratory judgment action. (A001-012.) The district court did not find it necessary to address Utility's assertion that the court lacks subject matter jurisdiction. (A012.) This appeal followed, in which Digital Ally seeks a reversal, or vacation, of the judgment of the district court.

## I. Statement of Facts

The following facts were submitted by Digital Ally by way of its Complaint or by declaration. (A031-032 at ¶¶ 11-15; A359-363 at ¶¶ 3-29; A419-420 at ¶¶ 3-6.) These facts were undisputed and, in any event, in the context of a motion to dismiss, must be deemed true and must be construed in a light most favorable to Digital Ally. *See Avocent Huntsville Corp. v. Aten Intern. Co., Ltd.*, 552 F.3d 1324, 1328-29 (Fed. Cir. 2008).

### A. Digital Ally

Digital Ally is a Nevada corporation with a principal place of business in Lenexa, Kansas. (A028 at ¶ 1.) Digital Ally manufactures mobile video surveillance systems (digital video imaging and storage for the video) for use in law enforcement, security, and commercial applications. (A031 at ¶ 11.) These products are sold under various names, but some of its most popular mobile

4

surveillance products are the DVM-750, DVM-500+, and the DVM-400.  Digital
Ally has been selling these mobile surveillance products since March 27, 2006, and
is a prominent player in the marketplace.  (A031 at ¶ 14.)

### B.    Utility's Predecessor-in-Interest

Prior to Utility obtaining the '556 Patent in January 2013, Utility's
predecessor-in-interest met with Digital Ally in Kansas to discuss Digital Ally's
technology and a possible joint business venture or acquisition.  (A032 at ¶ 15.)
These interactions occurred when Utility's predecessor-in-interest owned the '556
Patent and, on information and belief, knew or should have known of any alleged
infringement by Digital Ally's products.  *Id.*  Based on a failure to mention
possible infringement of the '556 Patent after learning the details of Digital Ally's
technology, Digital Ally reasonably believed that the '556 Patent would not be
asserted against its products and continued to manufacture and promote these
products through its nationwide sales and distribution channels.

### C.    Utility's Contacts with Kansas

In late 2010, Utility began a concerted effort to establish itself as a partner
with Digital Ally that led to a number of purposeful contacts directed at Kansas.
(A359 at ¶ 3.)  The focus of these contacts was, generally, Digital Ally's mobile
video surveillance systems and, specifically, the DVM-750 and DVM-500+.  (*See*
A359-361 at ¶¶ 3-13.)  In November 2010, Utility's president, Ted Davis, faxed a

mutual non-disclosure agreement to Digital Ally's headquarters in Johnson County, Kansas. (A359-360 at ¶ 4; A365-370.) The purpose of this non-disclosure agreement was to "pursu[e] a proposed business transaction" with a Kansas company, and to protect the exchange of, among other things, "technical . . . information." (A359-360 at ¶ 4; A366.) During the burgeoning relationship, Utility acquired Digital Ally's products—the DVM-750 and DVM-500+—and conducted multiple tests on those products through late 2011. (A372-378.) Utility had multiple contacts with Digital Ally in Kansas during late 2011 reporting its results and findings on the tests it was conducting on the DVM-750. (A360 at ¶ 5.)

As part of the relationship, Utility requested and received a copy of Digital Ally's software and source code for the mobile surveillance products. (A360 at ¶ 6; A381.) Once Utility had finalized its review and testing of Digital Ally's source code and products (including the DVM-750 and DVM-500+), it attempted to formalize a business relationship relating to those very same products. (A360 at ¶ 7.) As part of these efforts, Utility sent a number of communications directly to Digital Ally in Kansas focused on formalizing the business relationship. (A383-388.) In September 2011, Utility attempted to formalize the relationship and sent to Digital Ally in Kansas a Letter of Understanding signed by Utility's CEO and Chairman of the Board, Robert McKeeman. (A360 at ¶ 7; A383-388.)

Utility's proposed Letter of Understanding with Digital Ally—dated September 29, 2011—contemplated a close relationship to "maintain 100% seamless technical compatibility at all times between the Digital Ally product line and the Utility Associates product line." (A360 at ¶ 8; A390-392.) The product line that was the focus of the Letter of Understanding was Digital Ally's mobile surveillance systems, such as the DVM-750. *Id.* The Letter of Understanding also makes clear that the relationship would give Utility's technical staff "expertise in the [Digital Ally] product line," which included the DVM-750 and DVM-500+. *Id.* At the time Utility sent its Letter of Understanding in September 2011, the products Utility had in its possession and for which it wanted to combine its own product line specifically included Digital Ally's DVM-750 and DVM-500+. (A360 at ¶ 5; A377-378.)

In addition to communications (email and otherwise) by Utility into Kansas, Utility also traveled to Kansas in November 2011 to learn more about Digital Ally's mobile surveillance products and to discuss the technical integration of Utility's products and Digital Ally's products. (A361 at ¶ 12; A399; A404-405.) Additionally, after sending its Letter of Understanding to Digital Ally, Utility sent at least two separate price quotes into Kansas for Digital Ally to use in its sales pitches. These quotes were for sales pitches to the City of Omaha, Nebraska in October 2011, and the Los Angeles Police Department in November 2011, for

integration of Utility's products with Digital Ally's products—such as the DVM-750 and DVM-500+. (A361 at ¶¶ 9, 11; A394-396; A401-402.)

In each of these situations, Utility was purposefully and directly focusing its activities and contacts into Kansas. Additionally, the contacts were focused on Utility forming a business relationship and receiving technical information from Digital Ally about the operation, software, code, and sales of its mobile surveillance systems—including the DVM-750 and DVM-500+.

Moreover, at least as early as the filing of Digital Ally's Complaint, Utility identified Kansas as a covered "sales region" on its website. (A052.) Utility also identified one of its employees as the Sales Director for sales in Kansas. *Id.* After the filing of the lawsuit, Utility modified its website and indicated that Kansas was an "open" region for which it did not dedicate any employees for sales. (A030-031 at ¶ 10; A052-054 (website and declaration dated January 24, 2014, after the filing of the Complaint); A090-091.)

### D. The '556 Patent

The '556 Patent was issued on December 14, 2004. (A014-022.) Since that time, the '556 Patent has been the subject of thirteen assignment-related actions, including at least four direct assignments. (A056-059.) According to these assignments, Utility purportedly acquired the '556 Patent on January 28, 2013, and recorded the assignment on June 4, 2013. *Id.* Prior to Utility acquiring the patent,

Utility's predecessor-in-interest met with Digital Ally to discuss Digital Ally's technology and possible joint ventures and/or acquisitions. (A032 at ¶ 15.)

### E. Utility's Threat Letters

At some point, Utility discontinued its efforts at establishing a business relationship with Digital Ally. At least as early as October 14, 2013, Utility began sending letters to Digital Ally's customers. (A029 at ¶ 3.) Specifically, both the State of Nebraska and the State of New York received a letter from Utility threatening that purchase or use of mobile video surveillance systems not licensed under the '556 Patent would constitute patent infringement, and could subject those customers to injunctive relief and monetary damages. (A029 at ¶ 3; A037-047; A049-050.)

The State of Nebraska has been a Digital Ally customer since April 2010 and has purchased and deployed the Digital Ally DVM-750 mobile surveillance system throughout the state. (A029 at ¶ 4.) Digital Ally is obligated to indemnify its customer, the State of Nebraska, from any lawsuit for patent infringement. (A361 at ¶ 14.) The State of New York is a long time Digital Ally customer and, over the years, has deployed nearly every model of Digital Ally's mobile surveillance systems. Digital Ally is obligated to indemnify its customer, the State of New York, from any lawsuit for patent infringement. (A361 at ¶ 15.)

On or about ███████████, Utility sent additional letters to at least ████ of Digital Ally's customers—█████████████████████████ ████████████████████████████████—also threatening that purchase or use of digital video surveillance systems not licensed under the Boykin Patent would constitute patent infringement, and could subject those customers to injunctive relief and monetary damages. (*See* A407-408; A410-413; A415.) These letters were identical to the letters sent to the States of Nebraska and New York. (*Compare id. with* A037-047; A049-050.)

### F.   Digital Ally's Declaratory Judgment Action

Due to the harm Digital Ally was (and is) suffering from Utility's letters, it filed a declaratory judgment action on October 25, 2013.   (A028-035.) Specifically, Digital Ally's Complaint sought a declaratory judgment of noninfringement for its mobile surveillance systems, including the DVM-750, DVM-500+, and the DVM-400.   (A029 at ¶ 3; A032 at ¶ 17.)   Digital Ally's Complaint also sought a declaratory judgment of unenforceability of the '556 Patent due to equitable estoppel.   (A033 at ¶¶ 19-21.)   This count alleged that absent the misleading conduct from Utility and its predecessor-in-interest, Digital Ally could have made changes to the operation of its mobile video surveillance systems to design around the '556 Patent.   *Id.*

10

## SUMMARY OF THE ARGUMENT

The district court erred in granting Utility's motion to dismiss for two reasons. First, the district court did not view Utility's contacts in Kansas in a light most favorable to Digital Ally. Specifically, it did not consider how Utility's contacts in Kansas—relating to the technical operation of Digital Ally's products—would "arise out of or relate to" a declaratory claim of noninfringement for those same products. Second, the district court gave no consideration to the contacts in Kansas by Utility's predecessor-in-interest. Those contacts included statements that led Digital Ally to believe the '556 Patent would not be asserted against it and gave rise to Digital Ally's declaratory claim for equitable estoppel, as pled in Digital Ally's Complaint for which Utility sought a dismissal. Those very same contacts should now be sufficient to support specific jurisdiction in Kansas for the equitable estoppel claim.

## ARGUMENT

### I.    Standard of Review

"Personal jurisdiction is a matter of law that [this Court] review[s] *de novo*." *Avocent*, 552 F.3d at 1328. Because this jurisdictional issue arises from a patent case, Federal Circuit law governs the question of personal jurisdiction. *Id.*; *Deprenyl Animal Health, Inc. v. Univ. of Toronto Innovations Found.*, 297 F.3d 1343, 1348 (Fed. Cir. 2002).

The parties did not conduct any discovery in the underlying case. Accordingly, Digital Ally need "'only to make a *prima facie* showing that [Utility is] subject to personal jurisdiction. As such, the pleadings and affidavits are to be construed in the light most favorable to [Digital Ally].'" *Avocent*, 552 F.3d at 1328-29 (quoting *Silent Drive, Inc. v. Strong Indus., Inc.*, 326 F.3d 1194, 1201 (Fed. Cir. 2003); *Grober v. Mako Prods., Inc.*, 686 F.3d 1335, 1345 (Fed. Cir. 2012). Additionally, "all factual disputes must be resolved in [Digital Ally's] favor in order to evaluate [the] *prima facie* showing of jurisdiction." *Deprenyl*, 297 F.3d at 1347; *see also Avocent*, 552 at 1328-29; *Behagen v. Amateur Baskeball Ass'n of the United States*, 744 F.2d 731, 733 (10th Cir. 1984). Finally, in the procedural posture of a motion to dismiss, "a district court must accept the uncontroverted allegations in the plaintiff's complaint as true and resolve any factual conflicts in the affidavits in the plaintiff's favor." *Elecs. for Imaging, Inc. v. Coyle*, 340 F.3d 1344, 1349 (Fed. Cir. 2003); *Deprenyl*, 297 F.3d at 1347.

## II.    Discussion of the Issues

Determining whether personal jurisdiction exists over an out-of-state defendant involves two separate inquiries. First, whether the forum state's long arm statue permits service of process. Second, whether the assertion of personal jurisdiction would violate due process. *Avocent*, 552 F.3d at 1329.

The Kansas long-arm statute authorizes the exercise of jurisdiction to the full extent permitted by the constitution. *Deprenyl*, 297 F.3d at 1350 (*citing Matter of Hesston Corp.*, 870 P.2d 17, 25 (Kan. 1994) ("The Kansas long arm statute . . . is liberally construed to assert personal jurisdiction over nonresident defendants to the full extent permitted by the due process clause . . . .")); *OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1090 (10th Cir. 1998) ("'Because the Kansas long-arm statute is construed liberally so as to allow jurisdiction to the full extent permitted by due process, we proceed directly to the constitutional issue.'")). Digital Ally only is proceeding on the question of whether specific jurisdiction has been established by Utility's contacts with Kansas. Thus, the jurisdictional analysis collapses into one question—whether the exercise of personal jurisdiction comports with due process.

The Supreme Court, in *International Shoe* and its progeny, established a two-prong test for whether the establishment of jurisdiction comports with due process. "First, the defendant must have 'minimum contacts' with the forum." *Deprenyl*, 297 F.3d at 1350. For the specific jurisdiction analysis, "the 'minimum contacts' prong requires the plaintiff to show that the defendant 'has purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities.'" *Id.* at 1350-51 (citing *Inamed Corp. v. Kuzmak*, 249 F.3d 1356, 1360 (Fed. Cir. 2001) and *Burger*

13

*King Corp. v. Rudzewicz*, 471 U.S. 462, 476-77 (1985)). "The second prong of the due process test affords the defendant the opportunity to defeat jurisdiction by presenting a compelling case that other considerations render the exercise of jurisdiction so unreasonable as to violate 'fair play and substantial justice.'" *Deprenyl*, 297 F.3d at 1351 (citing *Inamed*, 249 F.3d at 1360 and *Burger King*, 471 U.S. at 476-77).

This Court has described this analysis of personal jurisdiction by articulating a three-factor test: "The three factors for determining whether the exercise of personal jurisdiction over an out-of-state defendant comports with due process are: 1) whether the defendant 'purposefully directed' its activities at residents of the forum; 2) whether the claim 'arises out of or relates to' the defendant's activities in the forum; 3) whether the exercise of jurisdiction is 'reasonable and fair.'" *Deprenyl*, 297 F.3d at 1351 (citing *Inamed*, 249 F.3d at 1360 and *Akro Corp. v. Luker*, 45 F.3d 1541, 1545 (Fed. Cir. 1995)). The first two factors relate to the first prong of the Supreme Court analysis—the "minimum contacts" prong. The third factor relates to the second prong of the Supreme Court analysis—the "fair play and substantial justice" prong. *Deprenyl*, 297 F.3d at 1351.

When analyzing the second factor's requirement that the contacts "arise out of or relate to" the claim, this Court has made clear "'it is significant that the constitutional catch-phrase is disjunctive in nature, *indicating an added flexibility*

14

*and signaling a relaxation of the applicable standard from a pure 'arise out of'*

*standard*.'" *Avocent*, 552 F.3d at 1330 (citing *Inamed*, 249 F.3d at 1362)

(emphasis added); *Akro*, 45 F.3d at 1547.

In a specific jurisdiction analysis, "even a single act can support jurisdiction,

so long as it creates a substantial connection with the forum, as opposed to an

attenuated affiliation." *Red Wing Shoe Co., Inc. Hockerson-Halberstadt, Inc.*, 148

F.3d 1355, 1359 (Fed. Cir. 1998) (internal quotations omitted) (citing *Burger King,*

471 U.S. at 475, n.18). And, as this Court and the Supreme Court have noted, a

forum state (such as Kansas) "has a 'manifest interest' in providing its residents

with a convenient forum for redressing injuries inflicted by out-of-state actors."

*Akro*, 45 F.3d at 1549 (citing *Burger King*, 471 U.S. at 473). The injuries

complained of here—restraint of production of goods by means of a non-infringed

patent—"falls well within the boundaries of the sorts of injuries that [Kansas] has

an interest in discouraging." *Akro*, 45 F.3d at 1549.

## III.    Utility Purposefully Directed Its Activities at Digital Ally in Kansas

The facts regarding Utility's contacts with Kansas are largely undisputed.

Over the course of fifteen months, Utility undertook a concerted effort of directing

contacts into Kansas in order to establish a business partnership with Digital Ally

regarding its mobile surveillance systems. These efforts were not prompted by

Digital Ally.  Instead, they were initiated and repeated by Utility and include the

following activities:

- Late 2010:  Utility began its efforts of contacting Digital Ally to establish itself as a business partner for its mobile surveillance systems.  (A359 at ¶ 3.)

- November 2010:  Utility's president faxed a signed non-disclosure agreement to Digital Ally in Kansas in an effort to learn more about Digital Ally's mobile surveillance systems.  (A359-360 at ¶ 4; A365-370.)

- April 2011:  Utility acquired and tested Digital Ally's mobile surveillance systems, including the DVM-750 and DVM-500+.  (A360 at ¶ 5; A372-378.)

- April 2011:  Utility sends multiple pieces of correspondence into Kansas detailing the results of its testing on Digital Ally's mobile surveillance systems.  *Id.*

- August 2011:  Utility contacted Digital Ally in Kansas to detail the results of its testing of Digital Ally's DVM-750.  (A360 at ¶ 6; A381.)

- September 2011:  Utility's new president, Robert McKeeman, sent multiple emails to Digital Ally in Kansas attempting to formalize a business relationship relating to the integration of Utility's product with Digital Ally's mobile surveillance systems.  (A360 at ¶ 7; A383-388.)

- September 29, 2011:  Utility sent to Digital Ally in Kansas a signed Letter of Understanding that specifically contemplates Digital Ally helping Utility to "develop expertise in [Digital Ally's] product line."  (A360 at ¶ 8; A390-392.)

- October 2011:  Utility requested an in-person meeting in Kansas to discuss the technical operation and integration of Digital Ally's mobile surveillance products.  (A361 at ¶ 10; A398-399.)

16

- October 2011: Utility sent a sales quote for products to Digital Ally in Kansas for a sales pitch to the City of Omaha, Nebraska. (A361 at ¶ 9; A394-396.)

- November 2011: Utility sent a sales quote for products to Digital Ally in Kansas for a sales pitch to the Los Angeles Police Department. (A361 at ¶ 11; A401-402.)

- November 2011: Utility sales and technical employees traveled to Digital Ally's headquarters in Johnson County, Kansas, to meet with Digital Ally regarding its mobile surveillance systems and Utility's products. (A361 at ¶ 12; A404-405.)

These efforts at establishing a business relationship and learning more about Digital Ally's products were initiated by Utility and directed into Kansas. As the evidence shows, Utility—on its own initiative—repeatedly directed its activities at Digital Ally in Kansas in an attempt to establish and formalize a business relationship. Moreover, Utility drove these contacts over the fifteen-month period repeatedly prompting Digital Ally when it felt the process was not moving fast enough or in the right direction. And, even though the majority of these contacts were through electronic means, they were still activities directed at Kansas residents. *See Burger King,* 471 U.S. at 476 ("So long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there."); *Inamed,* 249 F.3d at 1362 (Defendant's negotiation efforts, accomplished entirely through telephone and mail from New Jersey, were sufficient to find personal jurisdiction in California); *Akro,* 45 F.3d at 1542-43

17

(reversing a dismissal for lack of personal jurisdiction even though neither defendant-patentee nor his agent had been to the forum state).

These contacts, over a fifteen-month period, are consistent with the amount of contacts found by this Court to be sufficient for "minimum contacts." *See Elecs. For Imaging*, 340 F.3d at 1351 (finding that contacts to California reporting the progress of a pending patent application, telephone conversations to California regarding the subject matter of the technology covered by the patent application, and having two representatives visit California for purposes of demonstrating the technology underlying what later issued as the patent constituted minimum contacts personally directed to California because they were "far from being random, fortuitous, or attenuated"); *Inamed*, 249 F.3d at 1361-62 (finding that negotiation efforts to enter into license agreements, all of which were over the phone or by mail and directed to California, in addition to an infringement letter, were sufficient to conclude that the contacts were purposefully directed to Inamed, a California resident); *Deprenyl*, 297 F.3d at 1351-53 (finding that contacts to Kansas regarding negotiation of a license agreement, mailing copies of correspondence with the PTO to Kansas, and having UTIF's president travel to Kansas twice to negotiate and amend the agreement pertaining to the technology that ultimately developed into the patent constituted minimum contacts directed at Kansas); *Akro*, 45 F.3d at 1546 (finding that only warning letters to patent counsel

in Ohio and entry into an exclusive license agreement constituted purposefully directed activities at residents of Ohio).

## IV. Digital Ally's Claims for Declaratory Judgment Arise Out Of or Relate To Utility's Activities in Kansas

Digital Ally's Complaint for declaratory judgment sets forth two separate causes of action: (1) noninfringement of the '556 Patent and (2) equitable estoppel of allegations of infringement of the '556 Patent. (A032-033 at ¶¶ 16-21.) In dismissing Digital Ally's Complaint, the district court devoted only one conclusory sentence to the analysis of whether and how Utility's contacts with Kansas arise out of or relate to Digital Ally's noninfringement claim. (A009 at 9 ("Those contacts were of an entirely different nature than enforcement-related activities in the forum which could support specific jurisdiction.").) The district court's analysis failed to recognize or apply the elements of Digital Ally's claims to Utility's contacts with Kansas.

In analyzing whether Utility's activities "arise out of or relate to" the action for declaratory judgment, this Court has made clear that "the relevant activities are those that the defendant [patent owner] 'purposefully directs . . . at the forum which relate in some material way to the enforcement or the defense of the patent.'" *Autogenomics, Inc. v. Oxford Gene Technology Ltd.*, 566 F.3d 1012, 1020 (Fed. Cir. 2009) (quoting *Avocent*, 552 F.3d at 1336); *see also Radio Systems Corp. v. Accession, Inc.*, 638 F.3d 785, 790 (Fed. Cir. 2011) ("[O]nly those

activities of the patentee that relate to the enforcement or defense of the patent can give rise to specific personal jurisdiction for such an action.").

## A. Digital Ally's Declaratory Claim for Noninfringement

As the evidence in the Complaint and declarations show, Utility's contacts with Kansas relate to Digital Ally's mobile surveillance systems. (*See* A028-A035; A359-363.) More specifically, the contacts Utility had with Kansas were to obtain information about the technical operation of Digital Ally's mobile surveillance products. These included contacts to ascertain how the DVM-750 operated, contacts that resulted in obtaining Digital Ally's products, contacts that resulted in testing of Digital Ally's products, contacts to obtain the DVM-750 software, and a Letter of Understanding meant to help Utility "develop expertise in [Digital Ally's] product line." (A359-360 at ¶ 4; A365-370; A360 at ¶ 5; A372-378; A360 at ¶ 6; A381; A360 at ¶ 7; A383-388; A360 at ¶ 8; A390-392; A361 at ¶ 10; A398-399.)

In the context of this motion to dismiss, these facts must be construed in a light most favorable to Digital Ally. *Avocent*, 552 F.3d at 1328-29; *Deprenyl*, 297 F.3d at 1347. Even though Utility has claimed these contacts related to a "business partnership," "all factual disputes must be resolved in [Digital Ally's] favor in order to evaluate [the] *prima facie* showing of jurisdiction." *Deprenyl*, 297 F.3d at 1347. And while the district court appears to have construed these facts in Digital

20

Ally's favor, it erred in its analysis of how these facts "arise out of or relate to" Digital Ally's claims for declaratory judgment.

As this Court is aware, a noninfringement analysis entails two steps: (1) determining the meaning and scope of the patent claims; and (2) *comparing the properly construed claims to the device accused of infringing*. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998). It is the analysis of this second step in which the district court erred.

Construing Utility's contacts in a light most favorable to Digital Ally, it is apparent that the contacts in Kansas related to the details (including the technical operation) of Digital Ally's mobile surveillance systems. These contacts included obtaining information on the technical operation of the DVM-750 and DVM-500+. (A359-360 at ¶ 4; A365-370; A360 at ¶ 5; A372-378; A360 at ¶ 6; A381; A360 at ¶ 7; A383-388; A360 at ¶ 8; A390-392; A361 at ¶ 10; A398-399.) Those products are the very same products for which Digital Ally is now seeking a declaration of noninfringement. (A032-033 at ¶¶ 16-18.) Thus, any noninfringement analysis necessarily will require an application of the properly construed claims *to the technical operation of the DVM-750 and DVM-500+*. This is, of course, the very same information Utility obtained through its repeated contacts with Kansas over a fifteen-month period. Thus, the contacts Utility had in Kansas where it obtained information about the operation of Digital Ally's mobile surveillance products

absolutely relate to (if not also arise out of) a declaratory claim for noninfringement.

The district court also erred in rejecting these contacts as "arising out of or relating to" Digital Ally's claims because Utility had not yet acquired the '556 Patent at the time it made these contacts. This fact, however, is not fatal to the specific jurisdiction analysis. As noted above, the relationship between Digital Ally and Utility ceased around November 2011. Approximately one year later in January 2013, Utility concluded its negotiations for acquiring the '556 Patent and executed the agreement giving it ownership. (A056-059.) Though these facts appear to present a novel circumstance for this Court in the specific jurisdiction analysis, this delay between the last contact and acquisition of the patent should not be fatal. It is not unreasonable to infer—particularly in the context of a motion to dismiss—that Utility's contacts in Kansas relating to the technical operation of Digital Ally's products were instrumental in, and perhaps what gave rise to, the decision to acquire the '556 Patent. Moreover, Utility could have used the very same information obtained through its contacts in Kansas to identify targets and perform infringement analyses prior to sending its threat letters to Digital Ally's customers.[2]

---

[2] As the Court will note from the evidence, Utility was involved with Digital Ally in sales pitches to the City of Omaha, Nebraska. (A361 at 9; A394-396.) Perhaps

Applying the law in this manner also would be a sound policy decision. If the Court were to find the mere absence of a patent to be fatal to the application of specific jurisdiction, it would allow for creative forum shopping by patent owners. For example, an individual (or company) could identify a potential target, develop a relationship and contacts with that target to obtain technical information on a competitive product and, after the relevant information has been obtained, cease all contacts within the forum. That individual could then use the technical information it had obtained to identify and purchase a patent for enforcement purposes, and would be secure in the fact that it would avoid jurisdiction in the target's forum because its contacts did not overlap with its ownership of the patent. This would, in essence, give patent owners a secure way to avoid jurisdiction in less than favorable forums through creative transfers of ownership of the patent prior to filing suit. Yet this is precisely the outcome that would be advocated by the district court's ruling.

## B.    Digital Ally's Declaratory Claim of Equitable Estoppel

The district court also erred in not considering Digital Ally's cause of action seeking a declaration of unenforceability of the '556 Patent due to equitable estoppel and how it "arises out of or relates to" Utility's contacts in Kansas.

---

not coincidentally, Utility later sent letters providing notice of the '556 Patent to the State of Nebraska, a longstanding customer of Digital Ally. (*See* A037-047.)

Generally, there are three elements that must be established to find equitable estoppel:

> [1]   The patentee, through misleading conduct, leads the alleged infringer to reasonably infer that the patentee does not intend to enforce its patent against the alleged infringer.  'Conduct' may include specific statements, action, inaction, or silence where there was an obligation to speak.

> [2]   The alleged infringer relies on that conduct.

> [3]   Due to its reliance, the alleged infringer will be materially prejudiced if the patentee is allowed to proceed with its claim.

*A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 2002).  Here, the facts in the Complaint, when read in a light most favorable to Digital Ally, support a finding that the misleading conduct "arises out of or relates to" contacts in Kansas made by Utility's predecessor-in-interest.

The facts relating to Digital Ally's equitable estoppel claim were set forth in its Complaint as follows:

> . . . Utility and its predecessors-in-interest knew or should have known of any alleged infringement as of March 27, 2006.  Utility and its predecessors-in-interest, however, delayed and remained silent regarding Digital Ally's alleged infringement until the threat letters were sent to Digital Ally's customers. . . .

> Utility's predecessor-in-interest misled Digital Ally into believing that the '556 Patent would not be asserted against Digital Ally or its customers for the user of Digital Ally's advanced digital video systems.  *Specifically, Digital Ally has previously met with Utility's predecessor-in-interest to discuss Digital Ally's technology and possible joint ventures and/or acquisitions.*  These interactions occurred when Utility's predecessor-in-interest owned the '556 Patent

and, on information and belief, knew or should have known of any alleged infringement by Digital Ally's products. Based on a failure to mention possible infringement of the '556 Patent after learning the details of Digital Ally's technology, Digital Ally reasonably believed that the '556 Patent would not be asserted against its products and continued to manufacture and promote these products through its nationwide sales and distribution channels. . . .

Through its dealings with Digital Ally as outlined in the foregoing paragraphs, Utility's predecessor-in-interest led Digital Ally to believe that it did not intend to enforce the '556 Patent against Digital Ally. Relying on this conduct, Digital Ally continued to manufacture and sell the products that form the basis of Utility's letters threatening patent infringement action against Digital Ally and/or its customers. Absent the misleading conduct of Utility's predecessor-in-interest, Digital Ally could have made design changes in order to design-around the '556 Patent's claimed technology. But because Digital Ally was led to believe the '556 Patent would not be enforced against its products, Digital Ally invested substantial time and effort into manufacturing the products at issue and engaged in a nationwide sales effort to place these products in the hands of its customers.

(A031-032, A033 at ¶¶ 14, 15, 20.) Utility made no attempt to rebut or contradict these facts. Thus, viewed in a light most favorable to Digital Ally, the evidence shows Utility's predecessor-in-interest met with Digital Ally in Kansas. Moreover, these contacts related to both the '556 Patent and the products and technology now at issue in Digital Ally's declaratory judgment action, and included conduct that led Digital Ally to believe the '556 Patent would not be asserted against it. Thus, the equitable estoppel claim "arises out of or relates to" the contacts in Kansas by Utility's predecessor-in-interest.

That these contacts were by Utility's predecessor-in-interest and not Utility itself is irrelevant. Courts have routinely found that such conduct may be imputed to a predecessor-in-interest for an equitable estoppel claim. *See generally Radio Sys. Corp. v. Lalor*, 709 F.3d 1124, 1131 (Fed. Cir. 2013) ("Our precedent confirms that equitable estoppel applies to successors-in-interest where privity has been established."); *Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1559 (Fed. Cir. 1997), *abrogated on other grounds by Cybor*, 138 F.3d at 1454-56 ("Zimmer's actions prior to the assignment of the patent rights are imputed to Eastman. A patentee cannot avoid the consequences of his laches by transferring the patent."); *Jamesbury Corp. v. Litton Indus. Prods., Inc.*, 839 F.3d 1544, 1555 (Fed. Cir. 1988), *overruled on other grounds by Aukerman*, 960 F.3d at 1042 ("The district court properly held Litton liable for the knowledge of [predecessor-in-interest] Contromatics . . . . Litton is entitled to rely on the lack of communication to Contromatics, as well as to itself, following the letter."); *see also Barnes & Noble, Inc. v. LSI Corp.*, 849 F. Supp. 2d 925, 931 (N.D. Cal. 2012) ("Imposing liability for tort-like conduct of a predecessor is an entirely different proposition than assessing the validity and enforceability of a property right obtained from a predecessor . . . . The case at bar involves property rights . . . . there are a number of cases that [ ] suggest that Lucent's conduct may be imputed to Defendants for a least some theories of unenforceability of patent rights,

including laches, estoppel, and inequitable conduct."); *Teradyne, Inc. v. Hewlett-Packard Co.*, No. C-91-0344 MHP, 1994 WL 327213, at *3-7 (N.D. Cal. June 24, 1994) (treating allegedly misleading conduct of Zehntel, predecessor entity to Teradyne, as equivalent to Teradyne's conduct for purposes of equitable estoppel defense to patent infringement claim); *In re Novon Int'l., Inc.*, No. 98-cv-0677E, 2000 WL 432848, at *5 (W.D.N.Y. Mar. 31, 2000) ("While the assignee of patent becomes vested with the rights of the patentee, he also takes subject to the legal consequences of the patentee's previous acts . . . ."). Utility should not be allowed to avoid the consequences of its predecessor-in-interest's actions in Kansas merely because of a transfer in ownership of the patent. Thus, just as this Court has found that actions by a predecessor-in-interest giving rise to equitable estoppel bind the current patent owner, this Court should also find that the contacts relating to estoppel in a forum by a predecessor-in-interest should bind the current patent owner for purposes of specific jurisdiction on that same estoppel claim.

## V.    The Exercise of Personal Jurisdiction in Kansas Is Reasonable and Fair

This Court considers several factors when determining if the exercise of jurisdiction would be so unreasonable as to violate fair play and substantial justice. "These factors include: 1) the burden on the defendant, 2) the interests of the forum state, 3) the plaintiff's interest in obtaining relief, 4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and 5) the

shared interest of the several states in furthering fundamental substantive social policies." *Deprenyl*, 297 F.3d at 1355 (citing *Asahi Metal Indus. Co. v. Super. Ct. of Cal.*, 480 U.S. 102, 113 (1987)). Instances of unreasonableness, however, are rare, and are limited to situations where "'the plaintiff's interest and the state's interest in adjudicating the dispute in the forum are so attenuated that they are clearly outweighed by the burden of subjecting the defendant to litigation within the forum.'" *Akro*, 45 F.3d 1541 at 1549 (quoting *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1568 (Fed. Cir. 1994)).

First, subjecting Utility to litigation in Kansas does not impose a burden on Utility that outweighs Digital Ally's interests in litigating in Kansas. In *Deprenyl*, this Court found that in light of modern transportation and communication methods, the burden of subjecting a Canadian corporation to litigation in Kansas was "relatively minimal." *Deprenyl*, 297 F.3d at 1356. Further, in *Beverly Hills*, this Court found that subjecting a corporation located in the People's Republic of China to litigation in Virginia was not a compelling burden for similar reasons. *Beverly Hills*, 21 F.3d at 1549. Consequently, it would not be overly burdensome to make Utility travel the short distance from Georgia to Kansas for the adjudication of this dispute. This is particularly true when Utility has admitted to both maintaining a sales representative to cover Kansas and transacting sales in

Kansas, which makes clear it is not a burden for Utility to travel to Kansas. (A084, A086, A092.)

Second, Kansas has a substantial interest in the patent-related dispute between Digital Ally and Utility. Digital Ally is a resident of Kansas with a principal place of business located in Lenexa, Kansas. As noted by this Court in *Deprenyl*, Kansas has a substantial interest in discouraging injury within its borders and in protecting its residents from claims of patent infringement that are unwarranted. *Deprenyl*, 297 F.3d at 1356; *see also Precor Inc. v. Keys Fitness Products, L.P.*, 178 F.3d 1313 (Fed. Cir. 1999) (finding that the state had a significant interest in adjudicating a case involving a company with its principal place of business in that state and where acts that occurred within that state).

Third, Digital Ally has an obvious interest in resolving this dispute in the forum it selected. Digital Ally is a Kansas-based company and chose Kansas to efficiently and judicially resolve this dispute in the very forum in which it is experiencing direct harm from Utility's ongoing conduct in enforcing the '556 Patent.

Fourth, the interstate judicial system's interest in obtaining the most efficient resolution of controversies is met by resolving this dispute in Kansas. Despite Utility's protestations to the district court that it is not accusing Digital Ally of infringing the '556 Patent through its letter campaign and other enforcement

activities, Utility filed a suit for patent infringement of the '556 Patent against Digital Ally in the United States District Court for the Northern District of Georgia on June 12, 2014, after this appeal was filed with this Court. *See Utility Associates, Inc. v. Digital Ally, Inc.*, No. 1:14-cv-01847-RWS (N.D. Ga.); *see also* A085; A093 (Utility stating "that Digital Ally has <u>not</u> been accused of patent infringement . . . ."). Utility's patent infringement suit in Georgia concerns exactly the same causes of action of the instant suit—Digital Ally's alleged infringement of the '556 Patent and the enforceability of the '556 Patent. Resolving this dispute in Kansas to a final judgment on the merits satisfies the interstate judicial system's interest in obtaining the most efficient resolution to the controversy at bar and avoids wasting court resources in both Kansas and Georgia.

Finally, Kansas has an interest in promoting uniform interpretation and enforcement of United States patent law. *See Deprenyl*, 297 F.3d at 1356. And in any event, because patent infringement is a matter of federal law, "'the shared interest of the several States in furthering fundamental substantive social policies'" is not implicated by this action. *See Patent Rights Prot. Group, LLC v. Video Gaming Techs., Inc.*, 603 F.3d 1364, 1371 (Fed. Cir. 2010) (quoting *Elecs. for Imaging,* 340 F.3d at 1352).

In sum, this is not a rare case of unreasonableness, and as such, subjecting Utility to litigate in Kansas would not violate traditional notions of fair play and substantial justice.

## CONCLUSION

For the reasons discussed above, the judgment of the district court should be reversed or, in the alternative, the judgment should be vacated and the case remanded to the district court for reconsideration on the question of the district court's personal jurisdiction over Utility for the declaratory judgment claims asserted in Digital Ally's Complaint.

Dated: June 17, 2014                    Respectfully submitted,


                                        /s/ Adam P. Seitz
                                        Adam P. Seitz
                                        ERISE IP, P.A.
                                        6201 College Boulevard
                                        Suite 300
                                        Overland Park, Kansas 66211
                                        Tel.: (913) 777-5600
                                        Fax: (913) 777-5601
                                        Email: adam.seitz@eriseip.com

                                        *Counsel for Plaintiff-Appellant*
                                        *Digital Ally, Inc.*

# <u>ADDENDUM TABLE OF CONTENTS</u>

<u>**Page**</u>

Memorandum  and Order of
The United States District Court for the District of Kansas
     filed April 9, 2014 .........................................................................................A001

Judgment in a Civil Case
     filed April 9, 2014 .........................................................................................A013

United States Patent No. 6,831,556
     dated December 14, 2004 ........................................................................A014

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

DIGITAL ALLY, INC.,

      Plaintiff,

      v.                                  No. 13-2550-SAC

UTILITY ASSOCIATES, INC.,

      Defendant.

MEMORANDUM AND ORDER

      This declaratory judgment action relating to patent infringement comes before the Court on Defendant's motion to dismiss for lack of subject matter jurisdiction and personal jurisdiction. Plaintiff opposes the motion. The Court has reviewed the parties' submissions, including Plaintiff's notice of supplemental authority and Defendant's response to it, and is prepared to rule.

**I. Facts**

      Plaintiff is a Nevada corporation with its principal place of business in Kansas. Plaintiff sells advanced digital video systems to consumers, including law enforcement agencies, across the country. Plaintiff's products are designed for law enforcement vehicles and commercial fleets, such as ambulances and taxis. Defendant, incorporated in Delaware and having its principal place of business in Georgia, is a competitor of Plaintiff's. Defendant has no offices in Kansas and none of its employees or sales

agents reside here. Defendant is not registered to do business in Kansas, but sells some products to a few customers in Kansas.

U.S. Patent No. 6,831,556 (the '556 Patent), titled "Composite Mobile Digital Information System," was originally issued in December of 2004. It has been assigned 13 times, most recently to the Defendant. The claims of this Patent relate generally to a surveillance system for the storage and transmission of digital data.

Since March of 2006 Plaintiff has been selling products which use technology similar to that used in Defendant's products covered by the '556 Patent. When the '556 Patent was owned by Defendant's predecessor-in-interest, Plaintiff met with that owner to discuss Plaintiff's technology and possible joint ventures and/or acquisitions. Based on that predecessor's knowledge of Plaintiff's technology and its silence regarding any infringement, Plaintiff believed that the '556 Patent would not be asserted against its products so continued to manufacture and promote them through its nationwide sales and distribution channels.

Before Defendant was assigned the '556 Patent, the following contacts were made in Kansas regarding a potential joint business relationship between the parties:

- In November 2010, Defendant's president faxed a signed mutual non-disclosure agreement to Plaintiff's headquarters in Kansas.

**A002**

- In April 2011, Defendant sent multiple emails to Plaintiff detailing the results of tests to integrate Defendant's product with Plaintiff's product.

- In August 2011, Defendant called Plaintiff to say that it had finished integrating the two products.

- In early September 2011, Defendant's new President sent multiple emails to Plaintiff explaining why it should resell Defendant's products as part of Plaintiff's mobile video surveillance systems.

- In September 2011, Defendant sent to Plaintiff a formal Letter of Understanding signed by Defendant's President.

- In October and November of 2011, Defendant sent sales quotes to Plaintiff for Plaintiff to use in sales pitches to two of its customers or potential customers.

- In October 2011, Defendant sent Plaintiff an email requesting a meeting in Kansas to discuss the business relationship.

- In November of 2011, two of Defendant's representatives came to Kansas and met with Plaintiff to discuss a potential joint business relationship between the parties. During this meeting, Defendant's employees gave a sales and technical presentation to Plaintiff's employees in Kansas. The meeting lasted less than 10 minutes, was unproductive, did not involve any discussion of

3

**A003**

patent infringement or the '556 Patent, and did not result in any

business relationship between the parties. Shortly after that

visit, the parties ceased discussions regarding any potential joint

business relationship.

Defendant acquired the '556 Patent in June of 2013. On and after

October 14, 2013, Defendant's Chairman and CEO, a non-lawyer, sent

letters to some of its potential customers, some of whom were Plaintiff's

customers located outside Kansas. Those letters were substantially similar to

the following:

Utility Associates, Inc. ("Utility") is the owner of Boykin United
States Patent No. 6,831,556 (the "Boykin patent") (attached). The
Boykin patent relates to mobile video surveillance systems and
methods. Utility has successfully manufactured and sold a mobile
video surveillance system that is covered by the Boykin patent.
Consequently, the Boykin patent has enjoyed a high degree of
commercial success, and a major mobile video surveillance system
provider has already paid for a license under the Boykin patent.

As your office considers the purchase of mobile video
surveillance systems for its public safety operations, you should
consider the consequences of purchasing such mobile video
surveillance systems from third parties that are not licensed under the
Boykin patent. If your office purchases mobile video surveillance
systems that are covered by the claims of the Boykin patent and that
are not licensed under the Boykin patent, [you are] liable for patent
infringement as a result of [your] use of such infringing mobile video
surveillance systems. Infringement may subject [you] to an injunction
against further use of the infringing mobile video surveillance systems
and may result in an award of damages not less than a reasonable
royalty, treble damages, attorney fees, and prejudgment interest.
Moreover, Utility is entitled to collect damages directly from the user of
the infringing mobile video surveillance systems leaving [you] left with
whatever value any indemnity from the seller of the infringing mobile
video surveillance systems might be worth if the seller does not have
substantial financial resources.

> Therefore, in order to avoid the adverse consequences that may
> result from the purchase of infringing and unlicensed mobile
> surveillance systems, your office should consider purchasing its mobile
> video surveillance system needs from Utility.

Dk. 1, Exh. A. The letters were not sent to Plaintiff and are not alleged to

have been sent to any of Plaintiff's customers in Kansas.

Thereafter, Plaintiff was contacted by concerned purchasing agents for

two of its customers who had received such letters – one in the State of

Nebraska and one in the State of New York. Plaintiff is obligated to

indemnify these customers from any lawsuit for patent infringement. On

October 25, 2013, eleven days after Defendant initially sent out some of

these letters, Plaintiff filed this action asking the Court to declare that its

products do not infringe Defendant's '556 Patent, or to equitably estop

Defendant from enforcing that patent due to the "misleading conduct" of

Defendant's predecessor-in-interest.

After Plaintiff filed this suit, it received feedback from some other

customers about similar letters Defendant had sent. One received a letter

from Defendant dated December 2, 2013, then sent Plaintiff an email

attaching that letter and asking Plaintiff whether it was licensed under the

'556 Patent or it had a reason why it didn't need to be. Dk. 15, Exh. K. In

February of 2014, that customer sent Plaintiff another email saying that it

could not process a purchase order for Plaintiff's products until it received a

response to its December email. Another customer also received a letter

from Defendant dated December 2, 2013. That customer had agreed "in late

2013" to purchase an order from Plaintiff by December 31, 2013, but thereafter expressed concerns with potential infringement and delayed its purchase from Plaintiff.

Plaintiff also alleges that its stock price took a marked dive beginning on October 23, 2013, due in significant part to its investors' knowledge of the Defendant's letter.

## II. Personal Jurisdiction

Defendant challenges both subject matter jurisdiction and personal jurisdiction. The Court chooses to first address the issue of personal jurisdiction. *See Sinochem Intern. Co. Ltd. v. Malaysia Intern. Shipping Corp.*, 549 U.S. 422, 423, 127 S.Ct. 1184, 167 L.Ed.2d 15 (2007) (" ... there is no mandatory sequencing of nonmerits issues ... A court has leeway, to 'choose among threshold grounds for denying audience to a case on the merits ....' ") (internal citations omitted).

### A. Standard

Personal jurisdiction issues in declaratory judgment cases relating to patent infringement are determined under Federal Circuit law. *Autogenomics, Inc. v. Oxford Gene Technology Ltd.*, 566 F.3d 1012, 1016 (Fed. Cir. 2009); *Silent Drive, Inc. v. Strong Indus., Inc.,* 326 F.3d 1194, 1201 (Fed.Cir. 2003). Where, as here, no discovery has been conducted, the plaintiff need only make a prima facie showing that the defendant is subject to personal jurisdiction. *Silent Drive,* 326 F.3d at 1201. Accordingly, the

A006

Court construes the pleadings and affidavits in the light most favorable to the plaintiff. *Id.*

A United States district court may exercise personal jurisdiction over a defendant if the defendant "is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located." Fed.R.Civ.P. 4(k)(1)(A). The district court's exercise of jurisdiction over an out-of-state defendant must be consistent with both the forum state's long-arm statute and the requirements of due process. *See Avocent Huntsville Corp. v. Aten Int'l Co.,* 552 F.3d 1324, 1329 (Fed.Cir. 2008). Because Kansas's long-arm statute is coterminous with due process limitations, *Marcus Food Co. v. DiPanfilo,* 671 F.3d 1159 (10th Cir. 2011), the personal jurisdiction issue in this case turns on whether the court's exercise of jurisdiction would be consistent with the requirements of due process.

### B. Specific Jurisdiction

Specific jurisdiction must be based on activities that arise out of or relate to the cause of action, and can exist even if the defendant's contacts are not continuous and systematic. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-73, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). To satisfy due process requirements for establishing specific jurisdiction over a defendant, the plaintiff must show that the defendant purposely directed its activities at residents of the forum and that the plaintiff's claim arises from or relates to those activities. In addition, the plaintiff must satisfy the court that the

**A007**

assertion of personal jurisdiction under the circumstances is reasonable and fair. *Breckenridge Pharm., Inc. v. Metabolite Labs., Inc.,* 444 F.3d 1356, 1363 (Fed.Cir. 2006).

In declaratory judgment actions, only those activities of the patentee that relate to the enforcement or defense of the patent can give rise to specific personal jurisdiction.

> In *Avocent Huntsville Corp.,* we explained that an action for a declaratory judgment "arises out of or relates to the activities of the defendant patentee in enforcing the patent or patents in suit," and that the relevant inquiry for specific jurisdiction is "to what extent … the defendant patentee purposefully directed such enforcement activities at residents of the forum and the extent to which the declaratory judgment claim arises out of or relates to those activities." 552 F.3d at 1332 (internal quotation marks and citations omitted). Thus, only those activities of the patentee that relate to the enforcement or defense of the patent can give rise to specific personal jurisdiction for such an action. *Id.* at 1336; *accord Autogenomics,* 566 F.3d at 1020.

*Radio Systems Corp. v. Accession, Inc.,* 638 F.3d 785, 789-790 (Fed. Cir. 2011). Thus "only enforcement or defense efforts related to the patent rather than the patentee's own commercialization efforts are to be considered for establishing specific personal jurisdiction in a declaratory judgment action against the patentee." *Autogenomics,* 566 F.3d at 1020, citing *Avocent Huntsville,* 552 F.3d at 1336.

Accordingly, where a patent holder's contacts within the state with a potential supplier are focused on generating a market for the patented product, not on enforcing or defending the particular patent, those contacts are insufficient for the exercise of specific personal jurisdiction in the state.

Defendant contends that the purpose of the 2011 meeting was "to discuss a business relationship unrelated to the '556 Patent," which it did not acquire until approximately 18 months later. Dk. 6 p. 3. Plaintiff contends that its digital video surveillance systems are the "very same systems for which [Defendant] was seeking a business partnership with [Plaintiff]" in 2011 and for which it is now threatening Plaintiff's customers with patent infringement. Dk. 15 p. 9.

The Court assumes the truth of Plaintiff's assertion above, yet the undisputed facts show that the communications between Plaintiff and Defendant in Kansas occurred long before Defendant acquired the '556 Patent, and were focused on the creation of a cooperative business arrangement to market products. Those contacts were of an entirely different nature than enforcement-related activities in the forum which could support specific jurisdiction.

The only other purposeful direction of Defendant's activities at residents of Kansas is Defendant's sales to five customers here, but Plaintiff does not allege that its claim arises from or relates to those activities.

Nor does Plaintiff rely on the letters in asserting personal jurisdiction over Defendant, as no evidence shows that any such letter was sent to anyone in Kansas. Yet even if the Court construed Defendant's letters as cease-and desist letters, and even had Defendant sent them to Plaintiff's customers in Kansas, that would alone be insufficient to subject Defendant

A009

to personal jurisdiction in Kansas. *See Red Wing Shoe Co. v. Hockerson–Halberstadt, Inc.,* 148 F.3d 1355, 1360 (Fed.Cir. 1998) (holding that three cease-and-desist notices sent by a patentee to an alleged infringing party in a different state are not sufficient to subject the patentee to specific jurisdiction in that state). As a matter of patent law policy, "[p]rinciples of fair play and substantial justice afford a patentee sufficient latitude to inform others of its patent rights without subjecting itself to jurisdiction in a foreign forum." 148 F.3d at 1360–61. Accordingly, no basis for specific jurisdiction has been shown.

### C. General Jurisdiction

Plaintiff also makes a cursory argument that this court has general jurisdiction over Defendant because Defendant has had "continuous and systematic general business contacts" with Kansas. *See Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 416, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). General jurisdiction "requires that the defendant have 'continuous and systematic' contacts with the forum state and confers personal jurisdiction even when the cause of action has no relationship with those contacts." *Silent Drive,* 326 F.3d at 1200 (quoting *Helicopteros,* 466 U.S. at 416).

To meet its burden, Plaintiff relies in part on the fact that Defendant maintains a sales representative specifically covering Kansas. At the time this suit was filed, Defendant had one agent responsible for sales in

**A010**

approximately 20 states, including Kansas, in the western region of the United States. From January of 2011 through December of 2013, Defendant sold its products to five customers in Kansas, amounting to 1.7% of Defendant's total sales for that three-year period. This very small volume of sales falls short of enough to support general jurisdiction. *See Campbell Pet Co. v. Miale*, 542 F.3d 879, 881–884 (Fed.Cir. 2008) (finding 2% insufficient).

Plaintiff also relies on Defendant's contacts with the Plaintiff in Kansas, which consist largely of emails sent to Plaintiff in Kansas, and one personal meeting in Kansas. But Defendant has no physical presence or license to do business in Kansas, and none of the facts show that Defendant had more contact with Kansas than the defendant in *Helicopteros* had with Texas— repeated purchases and visits by personnel over a number of years. *See* 466 U.S. at 418, 104 S.Ct. 1868 (holding that "purchases, even if occurring at regular intervals" were insufficient to establish general personal jurisdiction over a nonresident corporation); *Campbell Pet Co.*, 542 F.3d at 881–884 (Fed.Cir. 2008) (finding no general jurisdiction from twelve sales yielding about $14,000 in revenue over eight years, conference attendance in forum where products were demonstrated and orders taken, and a generally accessible website); *Grober v. Mako Products, Inc.*, 686 F 3d 1335, 1346 (Fed. Cir. 2012) (finding no general jurisdiction where defendant shipped some product into forum state, exhibited products at a trade show there,

11

**A011**

and placed an ad twice a year in a nationally distributed trade publication based in the forum state, and listed on its website a contact in the forum state). Rather, this "is a classic case of sporadic and insubstantial contacts with the forum state, which are not sufficient to establish general jurisdiction over the defendants in the forum." *Campbell Pet Co.,* 542 F.3d at 884.

## III. Subject Matter Jurisdiction

The court finds it unnecessary to address Defendant's assertion that the court also lacks subject matter jurisdiction.

IT IS THEREFORE ORDERED that Defendant's motion to dismiss (Dk. 6) is granted based on lack of personal jurisdiction.

Dated this 9th day of April, 2014, at Topeka, Kansas.


s/Sam A. Crow
Sam A. Crow, U.S. District Senior Judge

**A012**

# UNITED STATES DISTRICT COURT
# DISTRICT OF KANSAS

## JUDGMENT IN A CIVIL CASE

**DIGITAL ALLY, INC.,**

**Plaintiff,**

**v.**                                                    **CIVIL CASE: 13-2550-SAC**

**UTILITY ASSOCIATES, INC.,**

**Defendant.**

**( )**   **JURY VERDICT.**   This action came before the Court for a trial by jury.   The issues have been tried and the jury has rendered its verdict.

**( X )**   **DECISION BY THE COURT.**   This action came before the Court.   The issues have been considered and a decision has been rendered.

   **IT IS ORDERED AND ADJUDGED** that pursuant to memorandum and order, (Doc. 27) filed April 9, 2014, defendant's motion to dismiss (Doc. 6) is granted base on lack of personal jurisdiction.

Entered on the docket   4/9/14

**Dated:   April 9, 2014**                    **TIMOTHY M. O'BRIEN, CLERK**

                                             A "Ruby"
                                             **By: Deputy Clerk**

US006831556B1

## (12) United States Patent
Boykin

(10) Patent No.: **US 6,831,556 B1**
(45) Date of Patent: **Dec. 14, 2004**

(54) **COMPOSITE MOBILE DIGITAL INFORMATION SYSTEM**

(75) Inventor: **Paul R. Boykin**, Mt. Juliet, TN (US)

(73) Assignee: **Digital Safety Technologies, Inc.**, Nashville, TN (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 8 days.

(21) Appl. No.: **09/855,653**

(22) Filed: **May 16, 2001**

(51) Int. Cl.[7] ................................................. G08B 1/08
(52) U.S. Cl. ................... 340/539.1; 340/937; 348/143; 348/148; 701/35
(58) Field of Search .......................... 340/539.1, 426.1, 340/426.13, 426.16, 426.19, 426.2, 426.25, 937; 348/143, 148; 701/35, 36

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,677,979 A * 10/1997 Squicciarini et al. ......... 386/46

| | | | |
|---|---|---|---|
| 5,815,093 A | * 9/1998 | Kikinis | ........................ 340/937 |
| 6,002,326 A | * 12/1999 | Turner | ........................ 340/426 |
| 6,298,290 B1 | * 10/2001 | Abe et al. | ..................... 701/35 |
| 6,389,340 B1 | * 5/2002 | Rayner | ........................ 701/35 |
| 6,411,874 B2 | * 6/2002 | Morgan et al. | ............... 701/36 |
| 6,421,080 B1 | * 7/2002 | Lambert | ..................... 348/143 |
| 6,518,881 B2 | * 2/2003 | Monroe | ..................... 340/539 |

* cited by examiner

Primary Examiner—Daryl Pope
(74) Attorney, Agent, or Firm—Sughrue Mion, PLLC

(57) **ABSTRACT**

A surveillance system includes a device for capturing video, audio, and data information. The device is provided in a first location, such as a vehicle. A server is provided for integrating and storing the captured information in the vehicle. The server may be a mobile server which is capable of transmitting the captured information from the vehicle to a second location, such as a building.

**25 Claims, 2 Drawing Sheets**





Fig. 1

Case 2:13-cv-02550-SAC-KGS Document 1-4 Filed 10/25/13 Page 4 of 10
Case: 14-1420 CASE PARTICIPANTS ONLY Document: 11 Page: 57 Filed: 06/17/2014

A016



FIG. 2

US 6,831,556 B1

**1**

## COMPOSITE MOBILE DIGITAL INFORMATION SYSTEM

### TECHNICAL FIELD

The present invention is directed to a composite mobile digital information recording system. In particular, the present invention is directed to a system for use in public and commercial vehicles to capture video, audio, and related information for surveillance and evidentiary purposes.

### BACKGROUND

Typical video recording systems, such as those currently deployed in police vehicles, use a standard fixed camera and a videocassette recorder (VCR) recording on a standard videotape, such as a video home system (VHS) tape. The VCR is usually located in the trunk of the vehicle. Recording quality is limited, primarily by the recording speed of the videotape. At standard speed the tape must be changed every two hours. At the slowest speed, a maximum of six hours is possible. Recording at the slowest speed, however, significantly reduces the quality of the recorded material.

Besides quality and capacity issues, VCR problems also include machine failure and tape failure, which require physical replacement and repair, and often occur without the knowledge of the user. Also, with respect to the videotapes, the user must physically remove and replace the videotapes in the VCR, and it is cumbersome to store the videotapes.

The VCR is a technical device nearing the end of its lifecycle; therefore, no serious advancements are on the drawing board that address the numerous technical issues incumbent to videotape recording. On the other hand, digital capture and storage are at the beginning of its technological curve, with rapid development of new devices. The only available means to ensure sufficient quality and control of video recording, access, and storage is an increase in the number of well-trained persons with those responsibilities. On the other hand, advancements of digital technologies are reducing the need for human involvement and even training.

The present invention is an elegant solution to the problems inherent in the current videotape systems deployed by public agencies and private companies for surveillance and evidentiary purposes.

### SUMMARY OF THE INVENTION

The present invention provides an effective and efficient method for capturing, transmitting, and storing potential evidentiary video and related information in mobile environments. The captured data is stored in onboard hard drives, or other storage facilities, such as flash memory, solid state memory, etc., and transferred to a home base data repository for archival, retrieval, and evidentiary use.

The present invention provides a surveillance system which includes a device for capturing video, audio, and data information. The device is provided in a first location, such as a vehicle. A mobile server is provided for integrating and storing the captured information in the vehicle. The mobile server is capable of transmitting the captured information from the vehicle to a second location, such as a building.

In addition, the present invention involves a method for managing video, audio, and data information which includes capturing the information, integrating the information into one data stream, and storing the data stream.

The invention also involves a computer system, interface, and computer program product for implementing the foregoing method.

**2**

### BRIEF DESCRIPTION OF THE DRAWINGS

The above objects and advantages of the present invention will become more apparent by describing in detail preferred embodiments thereof with reference to the attached drawings, in which:

FIG. **1** illustrates the present invention in a police car example; and

FIG. **2** illustrates a schematic diagram of the present invention.

### DETAILED DESCRIPTION

The present invention simultaneously captures and stores visual, audible, time, data, and motion-related activities for safety, emergency, and evidentiary purposes. The present invention can be deployed on police, fire, and rescue vehicles and is adaptable for use on transportation and industry vehicles, as well as having rail and airline applications. The present invention is not limited to these applications, and may be used in any environment in which a surveillance system is desired, either mobile or non-mobile.

The system generally operates through the integration of the following components: video capture; audio capture; related-data capture; an information integrator; a computer processing unit (CPU); a storage unit; and a transmission unit. The user has the option of video-only capture, audio-only capture, data-only capture, or any combination of the three information processors.

With the present invention according to the preferred embodiment, there is no limitation due to the tape speed or quality because digital video and related information are recorded on the hard drive of an onboard computer. The capacity of the present invention to capture, store, and transmit streams of video/audio/event information data significantly expands the value and the capacity of an onboard videotape surveillance system.

The embodiment disclosed herein is used in a police car wherein the information is captured, stored and can be transmitted back to a home base (e.g., a station precinct); however, the present invention is not limited to this example and may be used in any type of environment in which a surveillance system is desired.

FIG. **1** illustrates the present invention embodied in a police car **100**. In particular, a composite mobile digital information system (CMDIS) unit **150** is provided in the police car **100** for storing and transmitting captured information. In this example, up to four video cameras are strategically mounted in four locations on the police car **100** for use with the CMDIS **150**: a first camera **110** is mounted on a roof **102** facing forward; a second camera **120** is mounted on a rearview mirror **103** facing forward; a third camera **130** is mounted on a bumper (grill) **104** facing forward; and a fourth camera **140** is mounted on a front cage **105** facing towards a back seat **106**. Of course, varying numbers of cameras may be used in these or other desired locations.

The cameras **110–140** may be, for example, high-resolution National Television System Committee (NTSC) analog cameras, digital cameras, or component analog cameras. A multiplexer can be added to the cameras **110–140** to increase the number of views seen at one time.

The cameras located on the police car **100** can be remote controlled by a local user (e.g., officer), a remote user (e.g., precinct personnel), or can be operated to track the officer or specified object. Camera controls permit pan, tilt, record,

Case 2:13-cv-02550-SAC-KGS  Document 1-4  Filed 10/25/13  Page 6 of 10

Case: 14-1420 Case: 14-420  CASE PARTICIPANTS ONLY  Document: 13  Document: 9-11  Page: 59  Page: 59  Filed: 06/17/2014  Filed: 06/17/2014

US 6,831,556 B1

**3**

search, playback, focus and contrast adjustments, as well as other features which may be necessary for obtaining a high quality surveillance system. Moreover, one or more of the cameras **110–140** can also be enabled to automatically track the officer, without requiring any human input, if appropriate software is installed in a mobile server **200** (described later).

During recording and playback of the recorded data, digital coding provides tags for future search parameters. For instance, searchable identification code may be embedded in the data which is associated with a particular event. Thus, the data can be easily retrieved for evidentiary purposes at a later time without necessitating labor intensive searches of the recorded material.

With the present invention, data is digitally captured and processed from any one or all of the cameras for integration and storage in the mobile server **200** (see FIG. 2) of the CMDIS unit **150**. In addition, live views of video/audio/data information may be transmitted from the vehicle **100** to a home base **210** through high speed local links, e.g., cellular devices, as discussed in further detail later. In addition, video/audio/data information can be broadcast or transferred from the home base **210** to the vehicle **100**, or to multiple vehicles in various locations.

With respect to the capture of video information, the resolution of the video capture (or signal) is compressed or decompressed (encoded/decoded (CODEC) for transmission and then decoded once it reaches its destination) to provide the appropriate resolution for storage. Typical resolutions are 720×480, 320×240, or 160×120 pixels. Pixels are the smallest element of a video image. The lower the pixels selected, the lower the quality of the resolution and the higher the capacity for storing images.

In the present embodiment, a video capture processor and digitizer **220** captures, digitizes, and transmits the captured video to a video/audio/data information multiplexer/CODEC **250** of the mobile server **200**. The video/audio/data information multiplexer/CODEC **250** may include a digital signal processor (DSP) (e.g., the Texas Instruments TMS320C6415), or other similar device.

In addition to the video capture described above, an audio capture processor and digitizer **230** captures, digitizes, and transmits captured audio to the video/audio/data information multiplexer/CODEC **250**. In the example shown in FIG. 2, there is provision for the input of two audio sources **232, 234** to be digitally captured and processed. For example, a police officer can wear a wireless microphone **234** and one microphone **232** may be configured to capture sound from the rear seat of the vehicle **100**. After the audio is captured, the audio is transmitted to the video/audio/data information multiplexer/CODEC **250** and the appropriate CODEC (compression) is applied. Of course, the present invention is not limited to having two audio sources; an appropriate number of audio sources may be provided in a variety of locations depending on the application requirements.

A data capture processor and digitizer **240** captures various types of data which are also transmitted to the video/audio/data information multiplexer/CODEC **250**. In the present example, capture and processing of sixteen inputs **241** (e.g., time, various event information, and motion related events) are provided. For instance, the surveillance system of the present invention can capture and store the action of removal of a weapon from its rack, a car door opening or closing, the status of the ignition, air bag deployment, presence of an unauthorized individual, and vehicle speed. The various inputs can be configured according to a user need and the particular event.

**4**

In addition to the sixteen related-events inputs **241**, other automatically recorded data may include location, using a Global Positioning Satellite (GPS) receiver **242**, time of day, driver name, unit number, and incident number and other types of relevant information.

Various ports are provided for allowing input and output of data. For example, two serial ports **246, 247** and two universal serial bus (USB) ports **248, 249** may be provided for additional data input and output. For example, the USB ports **248, 249** can be used to input information from a magnetic or optical reader **244** and a fingerprint reader **245**. One serial port **246** can be used to input and output data to and from a laptop **243**, and the other serial port **247** can be connected to receiving/transmitting device **283** (one of a variety of wireless modem, cellular, satellite, and microwave devices) that sends radio signals back to the home base or precinct **210**. Of course, the present invention is not limited to this configuration since a variety of ports can be provided depending on the types of data being captured and the parameters required for the specific application in which the present invention is employed. The transmitting/receiving device **283** may comprise any device capable of transmitting at least some of the audio, video, and data information collected by the server **200**. The transmitting receiving device **283** which is employed for a particular surveillance system will depend upon the user's preferences and environmental limitations.

The captured data from the sixteen inputs, GPS **242**, and ports are digitized and relayed to the video/audio/data information multiplexer/CODEC **250** and combined with the video and audio information from the video capture processor and digitizer **220** and the audio capture processor and digitizer **230** to create aggregated documentation that is sent to a storage unit **270** in one data stream. In particular, the stream of data is multiplexed into one final composite compressed stream. Thus, all of the various types of information are aggregated into a single data stream which is then stored in the storage unit **270**. Although in this embodiment the compression is shown in the multiplexer/CODEC **250**, this function can be carried out by software in an alternative embodiment, for example with CPU **260**.

The CPU server **260** runs embedded operating systems, such as Windows NT or a real-time operating system, and functions as a server for all sources of information. The CPU **260** can control the multiplexer/CODEC **250**, the storage unit **270**, and other aspects of the CMDIS **150**. In an alternative arrangement, the CPU **260** can perform the multiplexing function itself, thereby eliminating the need for a separate multiplexer.

The CPU **260** has remote access features that allow technicians to perform system maintenance and repairs at any time, day or night. If a user experiences a malfunction, technicians can examine and resolve it, or ship a repair part quickly. The remote service connection also provides field updating of new software features for the CMDIS **150**.

The CPU **260** may include a remote, local, and/or automatic tracking camera control **264**, for controlling the various functions of the cameras **110–140**, as discussed earlier.

The CPU **260** also commands the multiplexer/CODEC **250** to embed the searchable identification code (tags) which is associated with a particular event or information, into the data stream. The CPU **260** detects the particular events or information, and commands the multiplexer/CODEC **250** to include the tags.

In addition, a flash memory **272** may be provided for storing instructions for execution by the CPU **260**.

**A018**

US 6,831,556 B1

5

The storage unit **270** contains a random access memory (RAM) memory buffer **276**, and two hard disk storage drives **278** that are driven by the CPU **260**. The combined video/audio/data information stream is first sent to the RAM memory buffer **276** that holds two or more minutes of real-time information. The RAM memory buffer **276** refreshes every time a new record command tells the CPU **260** to transmit the first minutes of the buffered memory onto the hard drives **278**. One purpose of the RAM memory buffer **276** is to provide the operator with a view of the events that initiated the recording process. For instance, when information is being retrieved at a later date, the viewer is able to see the events and/or information which triggered the recording process.

More specifically, the processor CPU **260** commands the RAM memory buffer **276** to transmit the stored information to the permanent storage memory, e.g., the hard drive **278**, upon the triggering of a particular event. Such an event may include, but is not limited to, the activation of a siren on the police car **100**, the removal of a gun from its gun rack, sudden acceleration of the vehicle, etc. All of the information which was recorded during the specified time and saved to the RAM memory buffer **276** is then digitally saved to the permanent storage memory, e.g., one of the two onboard hard disk drives **278**. Thus, the surveillance system records an event, as well as a specified time before the event. This time period of information may be valuable for determining the events that transpired before the triggering event, e.g., removal of gun, acceleration of vehicle.

If the surveillance system is commanded to continuously record onto the permanent storage memory, a triggering event is not required for the CPU **260** to command the RAM buffer memory **276** to transmit captured information to the permanent memory storage. In other words, the RAM buffer memory **276** would continuously transmit information to the permanent memory storage.

The present invention is not limited to the use of hard disk drives. Solid state memory or other types of non-volatile, non-rotating memory devices may be substituted for the hard disk drives, e.g., flash, etc.

Moreover, the present invention is not limited to a RAM memory buffer. The invention may utilize any type of memory buffer, or may be a flash memory, etc.

A transmission unit **280** may house the serial port **247** connected to the wireless modem/cellular/satellite/microwave transmitting/receiving device **283**, allowing live transmission of video/audio information packets back to the home base (or precinct) **210** via a home base information receiver/transmitter **213** or networked computers. An operator located in the home base **210** is able to control which information is transmitted from the mobile server **200** back to the home base **210**. For instance, the operator may view location, and/or listen to audio, and/or access other data which is transpiring at the vehicle location. As broadband technology improves, increased amounts of data will be capable of being transmitted in this manner.

The operator may command the cameras **110–140** via the remote/local camera control **264**, as described above, to improve the composure, framing, and quality of the recorded data. The control **264** can be commanded from the mobile server **200**, or from a home base server **211** of the home base **210** via the home base information receiver/transmitter **213** and wireless device transmitter/receiver **283**. Moreover, the audio or other aspects of the data capture may be controlled from the home base location using the wireless transmission and receiving components. With this aspect of the invention,

6

it is possible to set up a remote surveillance system wherein personnel are not required at the remote location to operate the equipment.

When the vehicle **100** returns to the home base **210**, it is connected via a high-speed, high-capacity Ethernet controller **285** (such as a 3COM 1 GB controller) to the home base server **211** via port **290** and the digitally stored video/audio/related information (i.e., data stream) is data dumped to a home base master storage repository **212**. The data can be dumped through copper wire, wireless transmission, fiber optics, laser or other means. FIG. **1** illustrates an example wherein a data dump outlet **160** is provided on the police car **100** for connecting the port **290** to the home base information storage **212**. Once the data is loaded onto the main home base data servers **211**, it is instantly and readily available for review by authorized personnel (e.g., attorneys, public interest groups, agencies or other parties which may value the recorded information), and for transmission to courtrooms or other desired locations. In addition, the data can be viewed from a web browser or proprietary software. All recorded information data can be encrypted if desired.

In addition, an Ethernet controller **285** (e.g., 10/100 type) may be connected to a port **290** for transmitting information to the laptop **243**. With this configuration, the police officer, or another person who reaches the scene after an event has transpired, is able to view previously recorded information while in the vehicle **100**.

Due to the searchable identification code, i.e., tags, large amounts of information can be easily searched and viewed without requiring viewing irrelevant portions of the data. Moreover, a monitor or liquid crystal display (LCD) (typically provided on the laptop **243** and/or some other display device and/or at the home base) displays all of the recorded information at one time. Thus, for instance, the operator can view video, listen to audio, view time, date, location, and event-related data (e.g., removal of a gun from a weapon rack) simultaneously.

A particular event, such as activation of the light bar on the police vehicle, can initiate the capture and processing of information in the present invention. Alternatively, information can be continuously captured and processed throughout an officer's shift, over a predetermined amount of time, etc., as controlled by the CPU **260**.

One embodiment of the invention resides in a computer system. Here, the term "computer system" is to be understood to include at least a memory and a processor. In general, the memory will store, at one time or another, at least portions of an executable program code, and the processor will execute one or more of the instructions included in that executable program code. It will be appreciated that the term "executable program code" and the term "software" mean substantially the same thing for the purposes of this description. It is not necessary to the practice of this invention that the memory and the processor be physically located in the same place. That is to say, it is foreseen that the processor and the memory might be in different physical pieces of equipment or even in geographically distinct locations.

The computer system, such as the one in the above preferred embodiment, could include the CPU **260** and the flash memory **272** which are shown in FIG. **2**.

The above-identified invention may be embodied in a computer program product, as will now be explained.

On a practical level, the software that enables the computer system to perform the operations described further below in detail, may be supplied on any one of a variety of

US 6,831,556 B1

7

8

media. Furthermore, the actual implementation of the approach and operations of the invention are actually statements written in a programming language. Such programming language statements, when executed by a computer, cause the computer to act in accordance with the particular content of the statements. Furthermore, the software that enables a computer system to act in accordance with the invention may be provided in any number of forms including, but not limited to, original source code, assembly code, object code, machine language, compressed or encrypted versions of the foregoing, and any and all equivalents.

One of skill in the art will appreciate that "media", or "computer-readable media", as used here, may include a diskette, a tape, a compact disc, an integrated circuit, a ROM, a CD, a cartridge, a remote transmission via a communications circuit, or any other similar medium useable by computers. For example, to supply software for enabling a computer system to operate in accordance with the invention, the supplier might provide a diskette or might transmit the software in some form via satellite transmission, via a direct telephone link, or via the Internet. Thus, the term, "computer readable medium" is intended to include all of the foregoing and any other medium by which software may be provided to a computer.

Although the enabling software might be "written on" a diskette, "stored in" an integrated circuit, or "carried over" a communications circuit, it will be appreciated that, for the purposes of this application, the computer usable medium will be referred to as "bearing" the software. Thus, the term "bearing" is intended to encompass the above and all equivalent ways in which software is associated with a computer usable medium.

For the sake of simplicity, therefore, the term "program product" is thus used to refer to a computer useable medium, as defined above, which bears in any form of software to enable a computer system to operate according to the above-identified invention. Thus, the invention is also embodied in a program product bearing software which enables a computer to perform management of information according to the invention.

The computer readable medium could be read by the CPU **260** through a medium reader **266** as illustrated in FIG. **2**, for example.

The problems of current surveillance systems are eliminated with the present invention because the digital operation and storage is self contained. Also, the system of the present invention is easier to operate and maintain, reduces the risk of data loss, and overcomes data retrieval problems with current surveillance systems.

Digital storage capacity is virtually limitless. In current video systems, when used for evidentiary purposes, videotapes must be stored at appropriate temperatures and climates for up to 18 months. Though there are temperature requirements for digital storage, the range of acceptability is much wider than for videotape storage. Besides the required storage space for videotape, other physical storage issues include proper labeling, inventory control, potential for tampering (destruction, theft editing, or deleting), loss retrieval, and additional human handling errors. With the present invention, these problems are minimized because the data is stored on computer hard drives and/or computer tapes (e.g., back-up tapes) located in the home base data archiving facility along with other important data and computer equipment. These computer equipment rooms tend to be more secure than the typical videotape storage facility.

Also, when the recorded material is transferred from the mobile unit to a storage hard drive at the home base, there is no degradation of the material because there is no loss of image with a digital transfer.

With current systems, at the end of a shift the officer is required to remove all videotapes and turn them into a storage facility. However, with the present invention, the digitally stored material is data dumped via various download devices including wireless transfer, without human contact.

Data retrieval is much easier with the present invention than current systems, and during such retrieval loss of evidence is reduced. In videotape recording systems, it is necessary to conduct time consuming searches for the location of critical evidentiary scene evidence on the videotape. There is also the possibility of degradation of the tape during handling since it can stretch, break or crease. The tape may require handling by several different people to share scenes with other law enforcement officials, district attorneys, defense attorneys, judges, juries, and others.

In contrast, the digital video/audio/data information recorded by the present invention is time coded and can be easily searched without damage to data. The data can be transmitted to others for viewing via the Internet, in digital form on compact disks (CD) and digital video disks (DVD), on videotape, over low power video transmission, and through a variety of other formats without damaging or corrupting the original material.

The system of the present invention will alert the maintenance personnel in case of a system failure or error. A remote technician using a modem can solve most problems immediately. The system is compact and requires no physical contact from the officer to function properly.

While this invention has been particularly shown and described with reference to preferred embodiments thereof, it will be understood by those skilled in the art that various changes in form and details may be made therein without departing from the spirit and scope of the invention as defined by the appended claims.

What is claimed is:

1. A surveillance system for an emergency response vehicle, comprising:
   a device for capturing at least two of video, audio, and data information, said device provided in the emergency response vehicle, and
   a server for digitally integrating the captured information into one data stream and storing the data stream in the emergency response vehicle,
   wherein said server is operative to transfer the data stream from the emergency response vehicle to a second location.

2. The surveillance system according to claim **1**, wherein said server comprises:
   a storage unit for storing the data stream;
   a transmission unit for transmitting the data stream to the second location;
   a computer processing unit for controlling said storage unit, and said transmission unit.

3. The surveillance system according to claim **2**, wherein said server further comprises a video/audio/data information multiplexer for integrating the captured information into the data stream.

4. The surveillance system according to claim **3**, wherein said capturing device includes a digital video capturing device for capturing video information, an audio capturing

US 6,831,556 B1

**9**

device for capturing audio information, and a data capturing device for capturing data information, and said video/audio/data multiplexer integrates the video, audio and data information into the data stream.

**5**. The surveillance system according to claim **2**, wherein said capturing device continuously captures data, said storage unit includes a memory buffer for temporarily storing the continuously captured information and a permanent memory for permanently storing the captured information until said transmission unit transmits the captured information to the second location.

**6**. The surveillance system according to claim **5**, wherein said computer processing unit commands said memory buffer to transfer the stored information to said permanent memory upon the presence of a triggering event, so that a portion of the stored information, which was captured before the occurrence of the triggering event, is transferred to said permanent memory.

**7**. The surveillance system according to claim **5**, further comprising:

a wireless device for transmitting at least some of the captured information from the server to the second location when said server is remotely located from the second location; and

an Ethernet controller for transmitting the data stream to the second location when the server is located at the second location,

wherein said wireless device is adapted to receive information from the second location.

**8**. The surveillance system according to claim **7**, wherein said computer processing unit includes a camera control device, for controlling at least one camera that supplies video information for the video capturing device, said camera control device being controlled by one of said computer processing unit and a computer processing unit of the second location via said wireless device.

**9**. The surveillance system according to claim **1**, wherein said capturing device is a data capture processor and digitizer for receiving at least one of a plurality of data inputs and other event information which is then integrated, stored and transmitted by said server.

**10**. The surveillance system according to claim **1**, provided in a police vehicle.

**11**. The surveillance system according to claim **3**, wherein the multiplexer compresses the captured information.

**12**. The surveillance system according to claim **6**, wherein said triggering event includes at least one of activation of a siren, removal of a gun from a gun rack, sudden acceleration of the vehicle.

**13**. The surveillance system according to claim **1**, wherein each of said video, audio and data information is captured, integrated and stored in said server.

**14**. A surveillance system for an emergency response vehicle, comprising:

means for capturing at least two of video, audio, and data information;

means for storing the information in the emergency response vehicle;

means for digitally integrating the information into one data stream; and

means for transmitting the one data stream from the emergency response vehicle to a remote location.

**15**. A surveillance system for an emergency response vehicle, comprising

means for capturing at least two of video, audio, and data information;

**10**

means for storing the information in the emergency response vehicle;

means for integrating the information into one data stream;

means for transmitting the one data stream from the emergency response vehicle to a remote location;

a digital video camera; and

means for controlling said digital video camera from the remote location.

**16**. The surveillance system according to claim **15**, further comprising means for automatically controlling said digital video camera to track movements of an object.

**17**. A process for managing information obtained from a vehicle, the information including at least two of video, audio, and data information, comprising:

capturing the information;

digitally integrating the information into one data stream; and

storing the data stream in the vehicle.

**18**. The process for managing information according to claim **17**, further comprising:

transmitting the data stream to a storage device in a remote location.

**19**. A process for managing information obtained from a vehicle, the information including at least two of video, audio, and data information, comprising:

capturing the information;

integrating the information into one data stream;

storing the data stream in the vehicle;

embedding searchable identification codes in the data stream during the integrating of the information; and

transmitting at least a portion of the data stream via a wireless device to a receiving device in the remote location.

**20**. A computer system adapted to manage information from a vehicle, the information including at least two of video, audio, and data information, comprising:

a processor, and

a memory including software instructions adapted to enable a computer to perform the steps of:

capturing the information;

digitally integrating the information into one data stream; and

storing the data stream in the vehicle.

**21**. The computer system according to claim **20**, wherein the software instructions are adapted to enable the computer to perform the additional step of: compressing the information captured in the capturing step.

**22**. A computer program product for enabling a computer to manage information from a vehicle, the information including at least two of video, audio, and data information, comprising:

software instructions for enabling the computer to perform predetermined operations, and

a computer readable medium bearing the software instructions;

the predetermined operations including the steps of:

capturing the information;

digitally integrating the information into one data stream; and

storing the information in the vehicle.

**23**. The computer system according to claim **20**, wherein the step of capturing the information is performed by at least

US 6,831,556 B1

**11**

one of a digital video capturing device, an audio capturing device and a data capturing device, and the step of integrating the information is performed by a video/audio/data multiplexer.

**24**. The computer program product according to claim **22**, wherein the step of capturing the information is performed by at least one of a digital video capturing device, an audio capturing device and a data capturing device, and the step of

**12**

integrating the information is performed by a video/audio/data information multiplexer.

**25**. The computer program product according to claim **22**, wherein the predetermined operations further includes the step of: compressing the information captured in the capturing step.

\*    \*    \*    \*    \*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that, on this the 17th day of June, 2014, I electronically filed the Confidential Brief of Appellant with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered users:

> Stephen M. Schaetzel
> Meunier Carlin & Cullman, LLC
> 817 W. Peachtree Street, Suite 500
> Atlanta, Georgia 20208
> sschaetzel@mcciplaw.com
>
> Aaron E. Hankel
> Shook, Hardy & Bacon LLP
> 2555 Grand Boulevard
> Kansas City, Missouri 64108-2613
> ahankel@shb.com

*Counsel for Appellee*

I further certify that, upon acceptance and request from the Court, the required paper copies of the foregoing will be deposited with United Parcel Service for delivery to the Clerk, UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT, 717 Madison Place, N.W., Washington, D.C. 20439.

The necessary filing and service were performed in accordance with the instructions given to me by counsel in this case.

> /s/ Adrienne R. Acra-Passehl
> Adrienne R. Acra-Passehl
> GIBSON MOORE APPELLATE SERVICES
> 421 East Franklin Street, Suite 230
> Richmond, VA 23219

## CERTIFICATE OF COMPLIANCE
With Type-Volume Limitation, Typeface Requirements,
And Type Style Requirements

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

this brief contains <u>7,197</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

this brief has been prepared in a proportionally spaced typeface using <u>Microsoft Word</u> in <u>14 Times New Roman</u>.

June 17, 2014

/s/ Adam P. Seitz
Adam P. Seitz
ERISE IP, P.A.
6201 College Boulevard
Suite 300
Overland Park, Kansas 66211
Tel.: (913) 777-5600
Fax: (913) 777-5601
Email: adam.seitz@eriseip.com

*Counsel for Plaintiff-Appellant*
*Digital Ally, Inc.*